T.C. Memo. 2001-122

UNITED STATES TAX COURT

AMBASE CORPORATION, f.k.a. THE HOME GROUP INC., INDIVIDUALLY, AND
AMBASE CORPORATION, f.k.a. THE HOME GROUP INC., AS DESIGNATED
AGENT OF CITY INVESTING COMPANY, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 11816-95.                    Filed May 23, 2001.

M. Carr Ferguson, Jr., John A. Corry, Laura M. Barzilai, and
Marina A. Choundas, for petitioner.

Elsie Hall and Dante D. Lucas, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge: Respondent determined deficiencies in
petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1979 | $2,081,771 |
| 1980 | 3,660,891 |
| 1981 | 4,568,190 |

| | |
|------|-----------|
| 1982 | 4,052,244 |
| 1983 | 3,042,955 |
| 1984 | 2,493,442 |
| 1985 | 1,087,116 |

The sole issue for decision is whether petitioner is liable under sections 1441[1] and 1461 for withholding taxes on interest payments made to nonresident aliens.

FINDINGS OF FACT

Petitioner and Other Entities

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the related exhibits.

At the time of filing the petition, petitioner (AmBase Corporation) was a Delaware corporation that maintained its principal office in Greenwich, Connecticut. Petitioner assumed the Federal withholding tax liabilities of City Investing Co. (City) upon the liquidation of City in 1985.

City was incorporated in Delaware in 1967 and succeeded, through a merger in 1968, to a corporation of the same name incorporated in 1904. During the late 1970's, City was a multinational holding company with assets on a consolidated basis exceeding $4.2 billion and net equity of approximately $800 million. City engaged through its subsidiaries in manufacturing, housing, insurance, and other financial enterprises. City's

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

principal manufacturing operations included the manufacture of water heaters, steel drums and other containers, heating and air-conditioning equipment and freezers, the printing of magazines, and the modification and repair of aircraft.  Housing and related activities included the manufacture of mobile homes, conventional home building, the operation of a chain of budget motels, and a 59-percent interest in a Florida community builder.

During the years at issue, City's most significant subsidiary was the Home Group, Inc. (HGI),[2] which was wholly owned by City.  HGI was the parent company of the Home Insurance Co., which in 1975 was the 13th largest property and casualty insurer in the United States on the basis of net premiums written, the 15th largest in 1977 and 1978, and again the 13th largest in 1979.  In 1976, HGI and its subsidiaries had assets of approximately $2.5 billion and net equity of approximately $660 million.  In 1985, HGI together with its subsidiaries had assets in excess of $5 billion and net equity in excess of $744 million.

As the holding company for a multinational conglomerate, City managed the group's financial resources and needs.  During the 1970's, City sought financing for its rapidly growing subsidiaries by borrowing from various sources depending on where

---

[2] Before 1978, the name of the Home Group, Inc., was CityHome Corp.  "HGI" refers to the entity CityHome Corp. before 1978 and to the succeeding entity the Home Group, Inc., from 1978 onward.

terms were most favorable.  In 1977, City had notes payable of more than $70 million to U.S. banks pursuant to a revolving credit agreement dated April 1, 1975.  The notes bore interest at a floating rate of one-half percentage point above the prime rate, and the notes had maturities of 3 to 7 years.  In order to obtain long-term financing at a fixed rate and to reduce the amount of indebtedness owed to the U.S. banks under the revolving credit agreement, City sought access to the Eurobond market.

Eurobond Market/Use of Netherlands Antilles Finance Subsidiaries[3]

During the years at issue, a major capital market outside the United States was the Eurobond market.  The Eurobond market was not an organized exchange but rather a network of underwriters and financial institutions that marketed bonds issued by private corporations (including, but not limited to, finance subsidiaries of U.S. companies), foreign governments and their agencies, and other borrowers.  In addition to individuals, purchasers of the bonds included institutions such as banks (frequently purchasing on behalf of investors with custodial accounts managed by the banks), investment companies, insurance companies, and pension funds.  There was a liquid and well-capitalized secondary market for the bonds with rules of fair practice enforced by the Association of International Bond

---

[3] The description which follows is based upon the parties' stipulations.

Dealers.  Although most of the bond issues in the Eurobond market were denominated in dollars (whether or not the issuer was a U.S. corporation), bonds issued in the Eurobond market were also frequently denominated in other currencies.

The practice in the Eurobond market was for issuers of securities to provide indemnification for withholding taxes to foreign investors.  Foreign investors would not have purchased Eurobond obligations without such an indemnification because the imposition of withholding taxes would decrease their return on the Eurobond obligations.  If a withholding tax were imposed, the indemnification would increase the issuer's cost of borrowing, inasmuch as the issuer would have to pay a higher rate of interest to compensate debtholders for the 30-percent withholding tax.

According to an analysis prepared by the Joint Committee on Taxation, in the 1960's the U.S. Government adopted a program designed to curtail devaluation of the dollar by encouraging overseas borrowing by U.S. companies.  One element of the program was the enactment of the Interest Equalization Tax, which in general imposed a tax on the acquisition by U.S. persons of foreign securities from foreign persons.  By 1968, some U.S. corporations had begun to obtain capital overseas in the Eurobond market through the use of Netherlands Antilles finance subsidiaries.  The Netherlands Antilles finance subsidiaries

issued debt in the Eurobond market, generally guaranteed by the U.S. parent corporation, and lent the proceeds to the U.S. parent or its affiliates. Depending on the facts in a particular case, the U.S. parent's payment of interest on its indebtedness to the Netherlands Antilles finance subsidiary might be exempt from withholding tax by reason of the application of the U.S.-Netherlands Income Tax Convention, as extended by protocol to the Netherlands Antilles.

City's Finance Subsidiary

In June 1974, City organized a subsidiary in the Netherlands Antilles named City Investing Finance N.V. (Finance) to facilitate access to the Eurobond market. At some point, 20 shares of Finance's common stock at $1,000 par value were issued to City. City made a payment of $1,000 for 1 share of Finance's stock in May 1978; the remaining $19,000 due from City was treated as a "subscription receivable" on Finance's financial statements.

In 1977 and 1979, City undertook to raise approximately $30 million and $50 million, respectively, from sources outside the United States by having Finance issue notes in these amounts in the Eurobond market. The payment of principal and interest on these notes was unconditionally guaranteed by City. Finance immediately transferred the proceeds from the notes to City, in exchange for City's promissory notes. Before issuance of

Finance's notes on the Eurobond market, City, HGI, and Finance entered into a series of transactions intended to capitalize Finance, whereby the equity of Finance would consist of promissory notes issued by HGI.

1. 1977 Capitalization of Finance

On April 26, 1977, City transferred $13,200,000 from its bank account to Finance's bank account as a contribution to capital. On the same day, Finance transferred the $13,200,000 to HGI in exchange for a document captioned as a promissory note in that amount from HGI (1977 HGI note). The 1977 HGI note bore no interest, was unsubordinated and unsecured, and was payable on June 1, 1978, or upon demand thereafter. Also on April 26, 1977, HGI transferred to City the $13,200,000 received from Finance.

In its general activity ledger, City recorded the $13,200,000 transfer to Finance as a contribution to the capital of Finance and the receipt of $13,200,000 from HGI as a dividend received from HGI.

HGI disclosed the 1977 HGI note as an obligation to Finance on its audited financial statements for each of the years the 1977 HGI note was outstanding, which statements were submitted to the Securities and Exchange Commission and various State regulatory agencies. HGI informed the group of banks with which it had a revolving credit agreement of the issuance of the 1977 HGI note and the subsequent dividend to City. On April 27, 1977,

HGI requested and received the consent of each of the banks to the issuance of the 1977 HGI note, as required by the revolving credit agreement.

City prepared an offering circular for prospective purchasers of the notes to be sold by Finance in 1977 which disclosed that City's $13,200,000 capital contribution to Finance would be lent by Finance to HGI and that Finance's capital thereafter included the 1977 HGI note. The audited financial statements of both City and HGI were included in the offering circular.

2. Finance's 1977 Issuance of Notes

On May 5, 1977, Finance was the named issuer of $30 million of 8-3/4-percent notes on the Eurobond market, due May 1, 1984 (8-3/4-percent notes). Interest on the notes at the stated rate was payable annually. The 8-3/4-percent notes also provided that the issuer would, in general, indemnify the holders with respect to any withholding taxes that might be imposed by the United States or the Netherlands Antilles with respect to the payments under the 8-3/4-percent notes, by providing for the payment of additional interest sufficient to make the interest payment equal to the stated rate.[4] Finance's obligations to make principal and

---

[4] The 8-3/4-percent notes further provided the issuer with a right to redeem in the event that the foregoing additional interest became payable.

interest payments under the 8-3/4-percent notes were unconditionally guaranteed by City.

On the same day the 8-3/4-percent notes were issued, Finance transferred the $30 million proceeds to City. City issued a promissory note to Finance in the principal amount of $30 million (1977 promissory note). The 1977 promissory note provided that the principal amount owed would become due and payable at exactly the same time and in exactly the same amounts as the aggregate principal obligations of the 8-3/4-percent notes issued by Finance. The 1977 promissory note also required City to pay interest each year on any amount of indebtedness outstanding. The interest was to be equal to the sum of: (1) The total interest payable by Finance on the 8-3/4-percent notes; (2) an amount equal to one-fourth of 1 percent per annum of the aggregate principal amount of the 8-3/4-percent notes outstanding; and (3) an additional amount equal to the excess, if any, of Finance's annual costs of operation over its annual gross receipts from all sources.

The 1977 promissory note further provided that the portion of the interest payable by City equal to that payable by Finance on the 8-3/4-percent notes was due at the same time and in the same amount as the interest payments became due and payable by Finance on the 8-3/4-percent notes. The balance of the interest

payable by City to Finance was due only upon Finance's written notice to City.

### 3. 1979 Capitalization of Finance

On July 31, 1979, City drew a check payable to the order of Finance in the amount of $22 million as a contribution to capital. On the same day, the check was endorsed by Finance to the order of HGI. Also on the same day, the check was endorsed by HGI to the order of City, and City recorded a $22 million dividend from HGI on its general activity register. HGI issued a document captioned as a promissory note in the face amount of $22 million (1979 HGI note) to Finance in exchange for the endorsement of the $22 million check. The 1979 HGI note bore no interest, was unsubordinated and unsecured, and was payable on August 1, 1980, or upon demand thereafter.

HGI disclosed the 1979 HGI note as an obligation to Finance on its audited financial statements for each of the years the 1979 HGI note was outstanding, which statements were submitted to the Securities and Exchange Commission and various State regulatory agencies.

City prepared an offering circular for prospective purchasers of the notes to be sold by Finance in 1979 which disclosed that City's $22 million capital contribution to Finance would be lent by Finance to HGI, that HGI would pay this amount as a dividend to City, and that Finance's capital thereafter

would include the 1977 and 1979 HGI notes.  The audited financial statements of both City and HGI were included in the offering circular.

4. 1979 Issuance of Notes

On August 1, 1979, Finance was the named issuer of $50 million of floating rate notes (FR notes) on the Eurobond market, due August 1, 1986.  Interest on the FR notes was payable semiannually at a rate equal to one-half percent above the London interbank offered rate for 6-month Eurodollar deposits.  The FR notes also provided that the issuer would, in general, indemnify the holders with respect to any withholding taxes that might be imposed by the United States or the Netherlands Antilles with respect to the payments under the Notes, by providing for the payment of additional interest sufficient to make the interest payment equal to the stated rate.[5]  Finance's obligations to make principal and interest payments under the FR notes were unconditionally guaranteed by City.

On the same day the FR notes were issued, Finance transferred the $50 million proceeds to City.  City issued a promissory note to Finance in the principal amount of $50 million (1979 promissory note).  As with the 1977 promissory note, the 1979 promissory note provided that the principal amount owed

---

[5] The FR notes further provided the issuer with a right to redeem in the event that the foregoing additional interest became payable.

would become due and payable at exactly the same time and in exactly the same amounts as the aggregate principal obligations of the FR notes issued by Finance.  The 1979 promissory note also required City to pay interest each year on any amount of indebtedness outstanding.  The interest was to be equal to the sum of:  (1) The total interest payable by Finance on the FR notes; (2) an amount equal to one-fourth of 1 percent per annum of the aggregate principal amount of the FR notes outstanding; and (3) an additional amount equal to the excess, if any, of Finance's annual costs of operation over its annual gross receipts from all sources.

The 1979 promissory note further provided that the portion of the interest payable to City equal to that payable by Finance on the FR notes was due at the same time and in the same amount as the interest payments became due and payable by Finance on the FR notes.  The balance of interest payable by City to Finance was due only upon Finance's written notice to City.

5. <u>Consolidation of HGI Notes</u>

The 1977 HGI note and the 1979 HGI note had been consolidated into a third document captioned as a promissory note issued by HGI to Finance in an amount equal to the $35,200,000 combined face values of the first two notes (the consolidated HGI note), with a stated interest rate of 5.2 percent,

by the end of 1981.[6]  The consolidated HGI note was
unsubordinated and unsecured, was dated as of January 1, 1980,
and was payable on August 1, 1980, or upon demand thereafter.
The stated interest rate on the consolidated HGI note was never
paid but instead was accrued by Finance as an additional asset.

6. Operations of Finance

The managing directors of Finance included a Netherlands
Antilles trust company and various officers of City.  Finance had
no employees during the period 1977 through 1985.  During the
years at issue, Finance held annual meetings of its shareholders
and prepared annual financial reports.  Finance also filed annual
tax returns with the Netherlands Antilles tax authorities.  City
paid the general and administrative expenses of operating
Finance, including the taxes owed by Finance to the Netherlands
Antilles.

In general, when an interest payment on the 8-3/4-percent
notes or the FR notes was due and payable by Finance, City would
wire the amount of the interest payment into Finance's bank
account, which would then be paid out to the fiscal agent in
charge of paying the note holders on the same day.  The remaining
interest due to Finance from City under the terms of the 1977 and

---

[6] Petitioner has not been able to establish the exact date
of execution of the consolidated HGI note.  The earliest document
in the record mentioning the consolidated HGI note is the 1981
annual report of HGI.

1979 promissory notes--that is, an amount equal to one-fourth of 1 percent per annum of the aggregate principal amount of the 8-3/4-percent notes and FR notes outstanding and an amount equal to any annual cost of operation exceeding gross receipts--was never paid.  The monthly statements for Finance's bank accounts indicate that the monthly balance of the account never exceeded $1,000, which was the amount paid by City for 1 share of Finance's common stock.

7. Dissolution of Finance

On May 1, 1984, the aggregate principal on all of the 8-3/4-percent notes outstanding became due.  City transferred $27,405,000 into Finance's bank account which on the same day was transferred to the fiscal agent to repay the principal in the amount of $25,200,000[7] and make the final interest payment of $2,205,000.

After the 8-3/4-percent notes matured, Finance distributed $20,500,000 of the consolidated HGI note to City as a return of capital.  On September 6, 1985, City liquidated and dissolved Finance.  In connection with the liquidation, Finance distributed

---

[7] Of the $30 million of debt issued, $4.8 million had been canceled.  City entered into agreements with Blyth Eastman Dillon & Co. International Ltd. in connection with the 8-3/4-percent notes and with the Banque de Paris in connection with the FR notes to purchase in the open market up to maximum specified amounts of the notes under certain circumstances, which after purchase would be canceled and destroyed.  City used its own funds to pay for these purchases.

the remaining $14,700,000 of the consolidated HGI note to City as a return of capital.[8]  In the case of each distribution by Finance, City recorded capital contributions to HGI of the amounts of the consolidated HGI note distributed by Finance. HGI, in turn, recorded the extinguishment of the amounts of the consolidated HGI note transferred by Finance to City.

Tax Reporting of the Transactions

City filed Forms 1042, U.S. Annual Return of Income Tax To Be Paid at Source, for the taxable years ended December 31, 1979 through 1985, attached to which were Forms 1042S, Income Subject to Withholding Under Chapter 3, Internal Revenue Code, for each year reporting gross amounts of income paid to Finance and claiming a zero-percent rate of withholding tax for such payments based on Forms 1001, Ownership, Exemption, or Reduced Rate Certificate.

Respondent subsequently issued petitioner a statutory notice of deficiency, determining additional amounts of tax required to be withheld by City for the years at issue.

OPINION

Sections 871(a)(1) and 881(a)(1) generally impose a tax of 30 percent on amounts received as interest from sources within the United States by nonresident alien individuals and foreign

---

[8] The record does not indicate what was done with the FR notes upon the liquidation of Finance.

corporations. Payers of such interest are generally required under sections 1441 and 1442 to deduct and withhold therefrom an amount equal to the tax imposed by sections 871 and 881, and in the event that they fail to do so they are liable for those withholding taxes under section 1461.

In 1984 Congress repealed the 30-percent withholding tax imposed by sections 871 and 881 with respect to certain interest paid on portfolio debt, referred to as "portfolio interest".[9] Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 127, 98 Stat. 494, 648. Repeal, however, was only prospective in effect, applying to interest payments made with respect to debt obligations issued after July 18, 1984, the date of enactment of DEFRA. See DEFRA sec. 127(g)(1), 98 Stat. 652. For preexisting obligations, DEFRA provided special transitional relief from withholding taxes applicable to interest payments made on obligations issued before June 22, 1984 (the date of conference action), by corporations in existence on or before that date that met requirements based on the "principles" of certain previously

---

[9] Portfolio interest generally refers to interest payments made to a nonresident alien individual or foreign corporation (owning less than 10 percent of the payer entity) pursuant to debt obligations that are sold exclusively to non-U.S. persons with proper precautions taken that such debt obligations will not be held by U.S. persons. See secs. 871(h), 881(c), 163(f)(2)(B).

revoked revenue rulings issued in connection with the Interest Equalization Tax.[10]  DEFRA sec. 127(g)(3), 98 Stat. 652.

In the instant case, the parties dispute whether petitioner qualifies for the transitional relief provided in DEFRA section 127(g)(3).  In addition, the parties dispute whether, if petitioner is not eligible for relief under DEFRA section 127(g)(3), petitioner is nonetheless exempt from withholding liability pursuant to article VIII(1) of the income tax treaty between the United States and the Netherlands, as extended to the Netherlands Antilles (U.S.-Netherlands income tax treaty).[11]

Some background is helpful in understanding the transition provisions of DEFRA section 127(g)(3).  In the 1960's, U.S. companies began to raise capital through the Eurobond market by using specialized finance subsidiaries.  Such a finance subsidiary was organized exclusively to issue debt in the Eurobond market and lend the proceeds to its U.S. parent or domestic or foreign affiliates in exchange for a promissory note. The U.S. parent or other affiliate would typically guarantee the

---

[10] The Interest Equalization Tax was enacted in the Interest Equalization Tax Act, Pub. L. 88-563, 78 Stat. 809 (1964), and expired on June 30, 1974.

[11] Convention with Respect to Taxes on Income and Certain Other Taxes, Apr. 29, 1948, U.S.-Neth., 62 Stat. 1757, TIAS 1855 (extended to the Netherlands Antilles by Protocol, June 15, 1955, 6 U.S.T. 3696, TIAS 3366; amended by Protocol, Oct. 23, 1963, 15 U.S.T. 1900, TIAS 5665; modified and supplemented by Convention, Dec. 30, 1965, 17 U.S.T. 896, TIAS 6051).

Eurobond obligations of the finance subsidiary, and it was the strength of this guaranty on which the holders of the subsidiary's Eurobond obligations relied. Moreover, the U.S. parent (or affiliate) would make interest and principal payments on its promissory note to the finance subsidiary that generally mirrored the subsidiary's obligations to the Eurobond holders, and the subsidiary would use those payments to fund its payments to the bondholders. If the finance subsidiary was incorporated in a foreign jurisdiction, such as the Netherlands Antilles, having a tax treaty with the United States providing for an exemption from withholding tax on U.S.-source interest paid to a resident of the foreign jurisdiction, eligibility for such an exemption would typically be claimed with respect to the U.S. parent's payment of interest to the foreign finance subsidiary. See Joint Comm. on Taxation, Tax Treatment of Interest Paid to Foreign Investors, at 8-9 (J. Comm. Print 1984).

As recounted in the legislative history of the repeal of the withholding tax on portfolio interest, the use of such finance subsidiaries originally arose as a result of

> a change in the ruling policy of the IRS which
> encouraged foreign borrowings through finance
> subsidiaries. In the case of finance subsidiaries,
> domestic or foreign, the IRS was prepared to issue
> private rulings that no U.S. withholding tax applied if
> the ratio of the subsidiary's debt to its equity did
> not exceed 5 to 1 and certain other conditions were
> met. Numerous private rulings were issued on this

basis.  Finance subsidiaries were also sanctioned by a number of published rulings.[5]

[5] Rev. Rul. 73-110, 1973-1 C.B. 454; Rev. Rul. 72-416, 1972-2 C.B. 591; Rev. Rul. 70-645, 1970-2 C.B. 273; Rev. Rul. 69-501, 1969-2 C.B. 233; Rev. Rul. 69-377, 1969-2 C.B. 231.  [Id. at 9.]

The published rulings cited in the footnote were issued in connection with various issues raised by the Interest Equalization Tax, but a central conclusion in each was that indebtedness issued by a finance subsidiary in circumstances similar to those just described would be treated as its own and not the parent's, provided the ratio of the subsidiary's outstanding debt to its equity did not exceed 5 to 1.  After expiration of the Interest Equalization Tax, the Commissioner in Rev. Rul. 74-464, 1974-2 C.B. 46, revoked four of the foregoing revenue rulings[12] on the grounds that expiration of the Interest Equalization Tax

> eliminated any rationale for treating finance subsidiaries any differently than other corporations with respect to their corporate validity or the validity of their corporate indebtedness.  Thus, the mere existence of a five to one debt to equity ratio, as a basis for concluding that debt obligations of a finance subsidiary constitute its own bona fide indebtedness, should no longer be relied upon.  [Id., 1974-2 C.B. at 47.]

As further recounted in the legislative history, notwithstanding the Commissioner's unwillingness to issue rulings

---

[12] The remaining ruling, Rev. Rul. 72-416, 1972-2 C.B. 591, was revoked by Rev. Rul. 74-620, 1974-2 C.B. 380, on the basis of the same rationale as in Rev. Rul. 74-464, 1974-2 C.B. 46.

after 1974, U.S. companies continued to raise capital in the Eurobond market in the ensuing 10 years, employing finance subsidiaries incorporated in the Netherlands Antilles for this purpose and claiming exemption from withholding tax under the U.S.-Netherlands income tax treaty for interest paid to the Antilles finance subsidiary by its U.S. parent, on the basis of opinions of counsel. See S. Prt. 98-169 (Vol. I), at 418-419 (1984).

In 1984 when Congress acted to repeal the withholding tax for portfolio interest, it was aware that the use of Antilles finance subsidiaries to avoid the withholding tax during the prior decade, without favorable letter rulings, was subject to challenge under then-applicable law. The Senate Finance Committee, where repeal originated, stated in its report on the legislation that

> Because of a finance subsidiary's limited activities, the lack of any significant earning power other than in connection with the parent guarantee and the notes of the parent and other affiliates, and the absence of any substantial business purpose other than the avoidance of U.S. withholding tax, offerings by finance subsidiaries involve difficult U.S. tax issues in the absence of favorable IRS rulings. Since the marketing of a bond offering is based upon the reputation and earning power of the parent, and since the foreign investor is ultimately looking to the U.S. parent for payment of principal and interest, there is a risk that the bonds might be treated as, in substance, debt of the parent, rather than the subsidiary, and thus withholding could be required.[3]

> * * * Nevertheless, these finance subsidiary arrangements do in form satisfy the requirements for an

exemption from the withholding tax and a number of legal arguments would support the taxation of these arrangements in accordance with their form.  * * *

[3] Compare, e.g., Aiken Industries, Inc., 56 T.C. 925 (1971), and Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), 72-2 U.S.T.C. Paragraph 9494, cert. denied, 406 U.S. 1076, with Moline Properties, 319 U.S. 436 (1943), 43-1 U.S.T.C. Paragraph 9464 and Perry R. Bass, 50 T.C. 595 (1968). [Id. at 419].

See also Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 390 (J. Comm. Print 1984) (hereinafter General Explanation).

Concluding that tax-free access to the Eurobond market for U.S. companies should be direct, rather than through finance subsidiaries, the Finance Committee decided to repeal the withholding tax on portfolio interest paid to foreign corporations and nonresident alien individuals.  The Committee was "concerned, however, that repeal of the withholding tax, without a transitional period, may have a substantial negative impact on the economy of the Netherlands Antilles" because "the use of the Antilles as a financial center is likely to be substantially reduced".  S. Prt. 98-169 (Vol. 1), supra at 420. Therefore, the Committee "[provided] for a gradual phase-out, rather than immediate repeal, of the withholding tax" on interest paid with respect to portfolio debt, in the form of a reduction in the rate from 30 percent to 5 percent on interest received

after the date of enactment, followed by a gradual reduction to zero over a 4-year period.  Id. at 421.

The House version of the legislation did not provide for repeal.  At conference, a measure to repeal the withholding tax on portfolio interest was adopted, but the transitional provisions of the Senate version were replaced.  Instead of a phase-out of the withholding tax on all interest paid after enactment, the final conference version provided for immediate repeal, but only with respect to interest paid on obligations issued after the date of enactment.  The withholding tax would continue to apply to interest on obligations issued before that date.  However, a transition rule (DEFRA section 127(g)(3), at issue in this case) provided that interest paid on obligations issued before June 22, 1984, by foreign finance subsidiaries in existence on or before that date would be treated as paid to a resident of the country of the finance subsidiary's incorporation (and therefore eligible for applicable treaty exemptions) if the finance subsidiary "[satisfied] requirements based upon the principles set forth in" four revenue rulings.  H. Conf. Rept. 98-861, at 938 (1984), 1984-3 C.B. (Vol. 2) 1, 192.  These four revenue rulings were those issued in connection with the Interest Equalization Tax that in general recognized the corporate existence of a finance subsidiary if it maintained a debt/equity ratio not exceeding 5 to 1; i.e., Rev. Rul. 73-110, 1973-1 C.B.

454; Rev. Rul. 70-645, 1970-2 C.B. 273; Rev. Rul. 69-501, 1969-2 C.B. 233; and Rev. Rul. 69-377, 1969-2 C.B. 231.

The General Explanation states that the conference approach --i.e., repeal of withholding for prospective obligations, coupled with transitional relief for preexisting obligations still subject to withholding--was prompted by the same concern expressed in the Senate explanation; namely, to avoid an overly adverse impact on the Netherlands Antilles economy by providing "a gradual and orderly reduction of international financing activity in the Netherlands Antilles * * * [that would] mitigate any economic hardship that the withholding tax repeal might indirectly impose on that country."  General Explanation at 393.[13]

DEFRA section 127(g)(3), 98 Stat. 652-653, provides as follows:

> (3) Special rule for certain United States affiliate obligations.--
>
> (A) In general.--For purposes of the Internal Revenue Code of 1954, payments of interest on a United States affiliate obligation to an applicable CFC[14] in existence on

---

[13] The General Explanation also states one other rationale for prospective-only repeal:  in the case of preexisting obligations that had been issued underlying directly by U.S. persons and were held by foreign persons, retroactive repeal would produce windfall tax reductions for such foreign persons since the price of, and rate of return on, the obligations were set assuming that a withholding tax would apply.  See General Explanation at 392.

[14] A "United States affiliate obligation" for this purpose
(continued...)

or before June 22, 1984, shall be treated as payments to a resident of the country in which the applicable CFC is incorporated.

(B) Exception.--Subparagraph (A) shall not apply to any applicable CFC which did not meet requirements which are based on the principles set forth in Revenue Rulings 69-501, 69-377, 70-645, and 73-110.

The parties do not dispute that subparagraph (A) has been satisfied in this case.  Their dispute concerns whether Finance, an applicable CFC, falls within the exception to relief provided in subparagraph (B) because of a failure to satisfy requirements based on the principles of the applicable revenue rulings.

The General Explanation states that the principles of the revenue rulings listed in DEFRA section 127(g)(3)(B) (hereinafter listed rulings) "include, among other things, the maintenance of a specified debt-equity ratio."  General Explanation at 397. Otherwise, neither the statute nor the legislative history provides guidance as to the content of the other "principles" or contains any further gloss on the meaning intended by

---

[14](...continued) means an obligation of (and payable by) a United States person that is a related person (within the meaning of sec. 482, I.R.C. 1954) to an "applicable CFC".  DEFRA secs. 127(g)(3)(C)(ii), 121(b)(2)(E) and (F), 98 Stat. 653, 640.  An "applicable CFC" for this purpose means generally any controlled foreign corporation of which at least 50 percent of all voting power of all stock entitled to vote is owned by a U.S. shareholder and whose principal purpose is (1) to issue debt obligations that are sold exclusively to non-U.S. persons with appropriate precautions taken that such debt obligations will not be held by U.S. persons and (2) to lend the proceeds of such debt obligations to its affiliates.  DEFRA secs. 127(g)(3)(C)(i), 98 Stat. 653; 121(b)(2)(D),(G), 98 Stat. 640-641; secs. 957 and 958.

"requirements which are based on the principles set forth in" the listed rulings.

The parties agree that one principle set forth in the listed rulings is that the debt of a finance subsidiary will be treated as its own if the subsidiary maintains a ratio of debt to equity that does not exceed 5 to 1.[15] Beyond this point, the parties disagree. Respondent, while acknowledging that a test of the debt/equity ratio, rather than conventional substance-over-form principles, is to be used in determining whether a finance subsidiary should be disregarded as a conduit, nevertheless argues that the finance subsidiary's capitalization for purposes of the debt/equity ratio must withstand scrutiny under substance-over-form doctrine. Respondent contends that the listed rulings' principles require that a finance subsidiary's equity capital "must exist not only in form but also in substance" and that Finance's capitalization lacks the requisite substance. In respondent's view, the capitalization of Finance was "meaningless" because it was accomplished through a circular cash-flow; namely, the capitalization of Finance in connection with the issuance of both the 8-3/4-percent notes and the FR notes was accomplished by a transfer of cash from City to Finance

---

[15] This principle appears implicitly in the first two listed rulings, Rev. Rul. 69-377, 1969-2 C.B. 231, and Rev. Rul. 69-501, 1969-2 C.B. 233, and explicitly in the two later listed rulings, Rev. Rul. 70-645, 1970-2 C.B. 273, and Rev. Rul. 73-110, 1973-1 C.B. 454.

(as a purported capital contribution), followed by a transfer of this cash from Finance to HGI in exchange for HGI's promissory notes, followed by a dividend of the cash from HGI to City, all accomplished within the same day as prearranged. Moreover, respondent contends, the HGI notes were "highly irregular": interest was either not charged or below market and was never paid; there was no collateral or fixed schedule for repayment; and the notes were ultimately canceled without payment. The notes were unenforceable, respondent contends, for lack of consideration. Thus, respondent concludes: "Finance did not receive the actual benefit of the purported contribution to capital". Accordingly, in respondent's view, Finance's capitalization with the HGI notes should be disregarded, resulting in Finance's failure to satisfy the 5-to-1 debt/equity ratio mandated in DEFRA section 127(g)(3)(B).

Petitioner contends that Finance's equity capital consisted of the promissory notes of a creditworthy affiliate (HGI), the value of which at all times substantially exceeded 20 percent of Finance's outstanding indebtedness to the Eurobond holders. Accordingly, petitioner argues, Finance's capitalization conformed with the principles of the listed rulings which permit, inter alia, a finance subsidiary to invest its equity capital in the stock or debt of an affiliate and do not further restrict or

specify how the affiliate may use its capital.  For the reasons discussed below, we agree with petitioner.

We start with the observation that, since DEFRA section 127(g)(3)(B) articulates the test as "[meeting] requirements which are based on the principles set forth in" the listed rulings, whatever requirements must be met by the instant transactions to qualify for relief must be found in the principles of the listed rulings themselves.  The point is that it should not be assumed that substance-over-form principles, ordinarily applicable in construing a tax statute, automatically apply in interpreting the listed rulings.  We reach this conclusion because it is clear that in crafting the relief in DEFRA section 127(g)(3), Congress intended to displace, in important respects, conventional substance-over-form principles. The legislative history previously discussed reveals that Congress was well aware of the risk that typical finance subsidiaries would be disregarded as conduits under substance-over-form principles of tax law.  Congress declined, however, to draw a conclusion regarding the appropriate outcome under the prior law, choosing instead to provide a "safe harbor" under which a finance subsidiary would be recognized as the issuer of its debt if it met the debt/equity ratio and other requirements based on the "principles" of the listed rulings.  The listed rulings, by making a corporation's debt/equity ratio a

dispositive factor in determining conduit status, constitute a departure from the conventional substance-over-form approach.[16] We think there is considerable doubt that Congress, having set aside the otherwise applicable substance-over-form test for determining a conduit, nevertheless intended substance-over-form principles to govern the alternative "safe harbor" test provided in DEFRA section 127(g)(3)(B). Instead, we think that Congress, by articulating the standard with the somewhat cumbersome phrase "[meeting] requirements which are based on the principles set forth in" the listed rulings, intended to confine the applicable principles to those that could be derived from the listed rulings. Thus, we conclude that substance-over-form principles apply in construing the relief available under DEFRA section 127(g)(3) only to the extent that such principles may fairly be inferred from an examination of the listed rulings.

For this reason, we reject at the outset respondent's attempt to test the capitalization of Finance under case law involving substance-over-form doctrine, circular cash-flows, the step transaction doctrine, and similar theories. The cases applying such doctrines are simply inapposite in determining the

---

[16] The Commissioner acknowledged as much when he revoked the listed rulings upon the expiration of the Interest Equalization Tax in 1974, observing that there was no longer any rationale "for treating finance subsidiaries any differently than other corporations with respect to their corporate validity or the validity of their corporate indebtedness." Rev. Rul. 74-464, 1974-2 C.B. 46, 47.

principles of the listed rulings.  The listed rulings were entirely administrative in origin, and their treatment of debt/equity ratios as dispositive on conduit status was otherwise without foundation in tax law.  See Northern Ind. Pub. Serv. Co. v. Commissioner, 105 T.C. 341, 350-351 (1995), affd. 115 F.3d 506 (7th Cir. 1997).  As petitioner points out, at the same time the Commissioner was issuing the listed rulings (from 1969 through 1973), he obtained an important litigation victory supporting the application of substance-over-form or conduit theories to disregard transactions involving a corporation functioning as a conduit for interest payments to obtain treaty exemptions.  See Aiken Industries, Inc. v. Commissioner, 56 T.C. 925 (1971).  Although Aiken Industries addressed essentially the same issue as the listed rulings, the case is not mentioned in the rulings issued after it was decided.  The rulings after Aiken Industries instead reaffirmed the primacy of the debt/equity ratio established in the listed rulings issued before the decision in that case.  Clearly the Commissioner considered the principles of the listed rulings as distinct from the substance-over-form principles applied in Aiken Industries.  In DEFRA section 127(g)(3)(B), Congress adopted the former and not the latter in defining the scope of the intended relief.

Respondent also argues, however, that the substance-over-form principles he seeks to apply to Finance's capitalization can

be found in the listed rulings.  We disagree.  As the ensuing discussion will show, the listed rulings' application of substance-over-form principles to the capitalization of a finance subsidiary is decidedly more lax--that is, more deferential to form than substance--than the position urged by respondent in this case.

The seminal listed ruling, Rev. Rul. 69-377, 1969-2 C.B. 231, afforded recognition to a finance subsidiary's role as the issuer of debt in the following circumstances.  A domestic corporation, X, formed a wholly owned domestic finance subsidiary, Y, for the purpose of Y borrowing funds from foreign persons to be re-lent to or invested in certain foreign affiliates of X.  X contributed $5,000x to the capital of Y.  Y then sold $25,000x of 20-year debt obligations to foreign persons through a public offering in foreign countries and invested in or lent to the foreign affiliates of X the funds thus derived.  The debt obligations sold by Y were convertible into the capital stock of X, and X guaranteed repayment as well as performance of the conversion feature.

The ruling recognized the debt obligations sold by Y but guaranteed by X as the indebtedness of Y, the finance subsidiary. As two of the subsequent listed rulings make clear,[17] the basis

---

[17] See Rev. Rul. 70-645, 1970-2 C.B. 273; Rev. Rul. 73-110, 1973-1 C.B. 454.

in Rev. Rul. 69-377, supra, for recognizing the indebtedness as that of Y was Y's maintenance of a ratio of outstanding debt to equity no greater than 5 to 1.  Y's equity for this purpose was measured by the $5,000x in cash contributed to it by X. Significantly, however, Y's cash equity was promptly lent to or invested in X's foreign affiliates.  As the ruling makes clear:

> Y invested the net proceeds from the sale of the debt obligations and the cash contributed by X in foreign corporations [i.e., foreign affiliates of X] by acquiring the stock or debt obligations of such foreign corporations. [Id., 1969-2 C.B. at 232; emphasis added.]

Rev. Rul. 69-377 was subsequently amplified in Rev. Rul. 72-416, 1972-2 C.B. 591.[18]  In the latter ruling, the Commissioner held that it made no difference to the result reached in Rev. Rul. 69-377, supra, whether the finance subsidiary was initially

_____

[18] Although Rev. Rul. 72-416, 1972-2 C.B. 591, is not one of the four rulings listed in DEFRA sec. 127(g)(3)(B), it is an amplification of one such ruling (Rev. Rul. 69-377, 1969-2 C.B. 231).  According to the Commissioner, an amplification of a revenue ruling

> describes a situation where no change is being made in a prior published position, but the prior position is being extended to apply to a variation of the fact situation set forth therein.  Thus, if an earlier ruling held that a principle applied to A, and the new ruling holds that the same principle also applies to B, the earlier ruling is amplified.  * * * ["Definition of Terms", 1976-2 C.B. iv.]

Given the Commissioner's policy on amplifications, Rev. Rul. 72-416, supra, constitutes a further illustration of the principles of Rev. Rul. 69-377, supra, and is appropriately employed to delineate and clarify those principles.

capitalized with cash or with the parent's common stock where the stock was publicly traded and had a readily ascertainable value.

The second listed ruling, Rev. Rul. 69-501, 1969-2 C.B. 233, concerned what apparently came to be known as the bank-loop transaction.  In that ruling, a domestic parent formed a foreign finance subsidiary and capitalized it with cash equal to 20 percent of the face amount of parent-guaranteed debt obligations that the subsidiary would subsequently sell in a foreign public offering.  The cash for this purpose was borrowed by the parent from a foreign financial institution.  Upon receipt of the cash, the finance subsidiary deposited it with the same foreign financial institution.  The subsidiary's right to withdraw the deposit was not contingent upon the parent's repayment of its loan from the financial institution, and the deposit did not serve as collateral for the loan.  On this basis, the ruling held that the subsidiary was sufficiently capitalized to be recognized as the issuer of the debt obligations.

With respect to the third listed ruling, Rev. Rul. 70-645, 1970-2 C.B. 273, neither party argues that its fact pattern has any direct bearing on the issues in this case, and we agree.[19]

---

[19] Rev. Rul. 70-645, 1970-2 C.B. 273, did not address the particulars of a finance subsidiary's capitalization, as the finance subsidiary therein received a cash capital contribution which, so far as the ruling indicated, it retained throughout the period it had debt outstanding.  The ruling instead addressed whether a finance subsidiary may use a portion of its borrowings

(continued...)

The fourth ruling, Rev. Rul. 73-110, 1973-1 C.B. 454, concerned the appropriate computation of a finance subsidiary's debt/equity ratio where its capital contribution is made in one currency and its borrowings are made in another. Where different currencies are involved, an initial contribution to capital that is equal to 20 percent of the debt to be issued by a finance subsidiary may cease to be so as a result of fluctuating currency values. Rev. Rul. 73-110, supra, held that, in these circumstances, the debt/equity ratio need only be recomputed to reflect then-prevailing currency exchange rates if (1) the finance subsidiary undertakes additional borrowings or (2) the parent withdraws equity capital for any reason, such as a reduction in the finance subsidiary's outstanding indebtedness. Otherwise, the failure to maintain the required debt/equity ratio after the initial contribution is immaterial.

We believe the listed rulings evidence principles that are in clear conflict with many of respondent's arguments. Though

---

[19](...continued)
from third parties to make a capital contribution to a second-tier finance subsidiary. The ruling concluded that the first-tier finance subsidiary's debt/equity ratio was not adversely affected by its use of a portion of its third-party borrowings to make a capital contribution to a second-tier finance subsidiary, so long as neither the first-tier finance subsidiary nor its parent provided any guaranty with respect to the second-tier finance subsidiary's borrowing.

respondent contends that Rev. Rul. 69-377, 1969-2 C.B. 231, stands for the proposition that a finance subsidiary's equity "must exist not only in form but also in substance", we think the capitalization of the finance subsidiary in that ruling is itself highly artificial and formalistic.  The capitalization of the finance subsidiary with cash was entirely transitory; that is, the finance subsidiary's exchange of the parent's cash for the securities of affiliates appears to have been contemplated from the outset.  The finance subsidiary's exchange of the cash capital contribution for the affiliates' securities did not affect the ruling's conclusion.  Also, it was the finance subsidiary's transitorily held cash that was counted for purposes of the subsidiary's meeting the 5-to-1 debt/equity ratio in the ruling; the stock or debt of the affiliates for which the finance subsidiary exchanged the cash was not evaluated for this purpose. Indeed, where the cash was exchanged for affiliates' stock, it is difficult to see how the stock could have been counted for this purpose because the stock was not publicly traded and presumably had no readily ascertainable value.  Cf. Rev. Rul. 72-416, supra (parent's publicly traded stock, because it has a readily ascertainable value, may be substituted for cash in the capitalization of a finance subsidiary).  Further, the ruling does not address the consequences for the debt/equity ratio requirement in the event the value of the affiliates' stock

declines. The failure to address issues arising from any change in the value of the equity capital, once invested in other assets, suggests the ruling's emphasis falls entirely on the nominal amount of initial paid-in capital, a highly formalistic approach. This principle is reinforced in Rev. Rul. 73-110, supra, which held that if changes in relative currency values after the initial contribution to capital cause a finance subsidiary to fail to meet the required debt/equity ratio, the failure can be disregarded unless the subsidiary undertakes additional borrowing or the parent withdraws capital. Both rulings' "snapshot" approach of testing the ratio only at the time of the capital contribution or withdrawal is artificial and formalistic. Under such an approach, which treats subsequent changes in the value of the equity capital as largely irrelevant to the debt/equity ratio, we do not believe much economic substance inheres in a finance subsidiary's capitalization.

Overall, the inherent artificiality of the finance subsidiary's capitalization in Rev. Rul. 69-377, supra, is highlighted when one considers that the purpose of the whole undertaking was to obtain capital for the foreign affiliates, which is precisely where the cash used to capitalize the finance subsidiary ended up. The finance subsidiary thus functioned as a conduit both with respect to the borrowed funds and with respect to the contribution to its capital.

As part of his argument that Finance's capitalization lacked substance, respondent also contends that Finance received no benefit from the contribution to its capital. Rev. Rul. 69-377, supra, provides no basis for such a requirement and indeed is counter to it. In the ruling, the cash transferred to the finance subsidiary as a capital contribution could be invested in the stock of affiliates. There is no discussion of the affiliates' dividend-paying history or capacity. Absent such a showing, we are unable to see how the finance subsidiary in Rev. Rul. 69-377, supra, benefited from holding affiliates' stock in any greater degree than Finance benefited from holding the non-interest-bearing notes of HGI.

In a similar vein, respondent argues that the lack of commercially reasonable terms for the HGI notes further indicates that the notes lacked substance and should be disregarded as equity capital for purposes of DEFRA section 127(g)(3). Rev. Rul. 69-377, supra, however, permitted a finance subsidiary's capital to be invested in either debt or stock of affiliates. Given this indifference to the choice of debt or equity, we do not believe the failure to provide for interest on the HGI notes is fatal under the principles of that ruling. The HGI notes contained other characteristics of indebtedness. Each was unsubordinated and contained an unconditional promise to pay at a time certain or upon demand thereafter by a creditworthy obligor.

Although unsecured, the amounts of the obligations ($13,200,000 and $22 million) were small in relation to HGI's assets. HGI was the parent corporation of the Home Insurance Co., one of the 15 largest property and casualty insurers in the United States at the time, and had assets of over $2.5 billion and net equity of approximately $660 million in 1976, which increased to assets of over $5 billion and net equity of over $744 million in 1985. The HGI notes were disclosed on HGI's audited financial statements required to be submitted to the Securities and Exchange Commission and various State regulatory agencies. HGI's financial statements were also included in the offering circulars pertaining to Finance's Eurobond borrowings, suggesting the relevance of HGI's financial condition to prospective investors. In the case of its issuance of the 1977 HGI note, HGI was required to, and did, obtain the consent of several banks with which it had a revolving credit agreement.

Respondent also contends that the HGI notes' lack of substance is illustrated by the fact that they were ultimately canceled without any repayment. The listed rulings, however, clearly contemplate the parent's withdrawal of the finance subsidiary's equity capital upon the full or partial retirement of the subsidiary's borrowing. Rev. Rul. 73-110, 1973-1 C.B. 454, specifically addressed this point, citing the parent's withdrawal of capital from a finance subsidiary upon the

subsidiary's reduction of its debt load as one of the two occasions when a recomputation of the debt/equity ratio based on then-prevailing currency values was required. In the instant case, a portion of the HGI notes was transferred by Finance to City as a return of capital after repayment of the 8-3/4-percent notes. The remainder of the HGI notes was transferred from Finance to City in connection with Finance's liquidation. In each instance, City contributed the HGI notes to the capital of HGI, and HGI extinguished them. The extinguishment of the HGI notes without payment was consistent with the principles of the listed rulings, which permit the withdrawal of a finance's subsidiary's equity capital so long as the required ratio is maintained.

Respondent argues that the amplification of Rev. Rul. 69-377, 1969-2 C.B. 231, in Rev. Rul. 72-416, 1972-2 C.B. 591, to allow a finance subsidiary to be capitalized with the parent's publicly traded stock rather than cash also supports his position that a finance subsidiary's capitalization must have economic substance. In respondent's view, since the finance subsidiary's capital in Rev. Rul. 72-416, supra, consisted of "marketable securities" (respondent's term on brief), it has economic substance, apparently because of the liquidity of such assets. We believe this interpretation overlooks the peculiar features of a finance subsidiary. Since a finance subsidiary's sole function

is to issue debt and facilitate repayment, the only substantive role of its equity capital is to serve as security for the holders of its debt; i.e., as an avenue of recourse in the event of a default. Also central to the arrangement involving a finance subsidiary is the parent's guaranty of the debt, on which the lenders to the subsidiary are in fact relying. In this context, it does not appear that capitalizing the finance subsidiary with the common stock of its parent adds significant economic substance to the rights of the holders of the subsidiary's debt. If the parent is unable to meet its obligations under the guaranty, the fact that the subsidiary has equity capital in the form of the parent's stock (as opposed to, e.g., cash or publicly traded securities of some other entity) adds little to the substantive economic position of the debtholders.

In addition, respondent's characterization of the parent stock in Rev. Rul. 72-416, supra, as "marketable securities", a term that does not appear in the ruling, may misread the significance of the stock's publicly traded status to the ruling's conclusion. While respondent infers that the contributed stock's publicly traded, and therefore readily marketable, status gives the stock independent economic substance as equity capital, we think the ruling's language suggests that the significance of the contributed stock's being publicly traded

lies in its being readily <u>valued</u>. Unless the initial capital
contribution made to the finance subsidiary is susceptible of
ready valuation, the subsidiary's debt/equity ratio cannot be
computed. Thus, in concluding that the parent's stock can be
substituted for cash as the initial paid-in capital, the ruling
states:

> Since * * * [the parent's] common stock is daily
> traded on the stock exchange, it has a readily
> ascertainable value. <u>Therefore</u>, it is immaterial
> whether cash or the common stock of * * * [the parent]
> is contributed to * * * [the finance subsidiary].

> Accordingly, the holdings in Revenue Ruling 69-377
> are equally applicable in the instant case. [<u>Id.</u>,
> 1972-2 C.B. at 592; emphasis added.]

Rev. Rul. 69-501, 1969-2 C.B. 233, adds little to
respondent's case. From the standpoint of economic substance,
the bank-loop transaction sanctioned in that ruling is a curious
one. Cash borrowed from a bank was redeposited with the same
bank. Presumably this circular flow of cash within the same
financial institution reduced the parent's cost for the capital
contribution effected thereby to the spread between the interest
rate charged for the loan and the rate paid out for the deposit.
(The ruling does not address whether the finance subsidiary
received interest on the deposit or, if so, whether the
subsidiary retained it.) While the equity capital in Rev. Rul.
69-501, <u>supra</u>, consisting of an unrestricted claim to a third-
party bank deposit, contains more substance than that of the

other listed rulings discussed, we do not think Rev. Rul. 69-501, supra, can be reconciled with the other listed rulings to derive a "principle" or "requirement" to the effect that a finance subsidiary's capitalization must have economic substance to the extent urged by respondent herein.  The other rulings, especially Rev. Rul. 69-377, supra, concede too much to the contrary.

In the instant case, Finance was capitalized by means of two transfers of cash from City to Finance, which cash was immediately transferred[20] by Finance to HGI in exchange for promissory notes of equal face value, followed by HGI's transfer of the note proceeds back to City as a dividend.  City's cash capital contributions to Finance ($13,200,000 in 1977 and $22 million in 1979), as well as the face value of the HGI notes received by Finance in exchange for the cash, constituted 44 percent of the amounts borrowed by Finance on the Eurobond market ($30 million in 1977 and $50 million in 1979), well within the required 5-to-1 ratio.  Insofar as the capitalization of Finance consisted of contributions of cash followed by the investment of that cash in the securities of an affiliate, the transaction conforms with Rev. Rul. 69-377, supra.  However, the Finance transaction contains an additional feature, not present in Rev.

---

[20] In one instance, the cash was transferred into and out of Finance's bank account in the same day; in the other instance, a check from City was endorsed by Finance to the order of HGI, without the funds moving through Finance's bank account.

Rul. 69-377, supra; namely, the immediate cycling back to the parent of its cash contribution to the finance subsidiary's capital, via a series of steps in which Finance transferred the cash received from City to HGI in exchange for HGI's notes, followed by HGI's transfer of the cash to City as a dividend. This circular cash-flow distinguishes the capitalization of Finance from that in Rev. Rul. 69-377, 1969-2 C.B. 231, and is at the core of respondent's contention that the capitalization should be disregarded.

Respondent's contention raises the question of whether a capitalization involving a circular cash-flow--for example, where a finance subsidiary lends its cash capital contribution back to the parent--would be prohibited under the principles of the listed rulings. The listed rulings do not address the point directly. The listed rulings clarify various ways that a finance subsidiary may reinvest the cash contributed to it, such as in the stock or debt of affiliates (Rev. Rul. 69-377, supra) or a bank deposit (Rev. Rul. 69-501, supra), but contain no prohibitions. As we observed in Northern Ind. Pub. Serv. Co. v. Commissioner, 105 T.C. at 352 n.10, "nothing in * * * [the listed] rulings indicates the manner in which a financing subsidiary is required to invest its capital." However, Rev. Rul. 72-416, 1972-2 C.B. 591, which permitted the parent's own stock to serve as the equity capital for a finance subsidiary,

clarifies the principles of the listed rulings in a manner which indicates that a circular cash-flow would not be proscribed. If the parent may contribute its own stock as the equity capital, we see no principled reason why the parent's debt could not be substituted for this purpose, particularly given that Rev. Rul. 69-377, supra, allowed a finance subsidiary's capital to be invested in an affiliate's stock or debt. If a finance subsidiary may be capitalized with parent debt, then it would follow that a finance subsidiary receiving a cash capital contribution from the parent could re-lend that cash to the parent for the parent's note, resulting in a circular cash-flow. A circular cash-flow is therefore not inconsistent with, or implicitly prohibited by, the principles of the listed rulings.[21] Respondent's argument that the capitalization of Finance should be disregarded for purposes of DEFRA section 127(g)(3) because it involved a circular cash-flow is unavailing.[22] Finance's

---

[21] We note in this regard that the Commissioner reached the same conclusion in several private letter rulings issued during the period when the listed rulings were effective, where he held that a cash capital contribution to a finance subsidiary could be lent back to the parent without adversely affecting the subsidiary's equity capital for purposes of the 5-to-1 debt/equity ratio.

[22] We reach the same conclusion regarding an alternative argument of respondent's to the effect that Finance's capitalization with the HGI notes should be disregarded because the notes were unenforceable because of a lack of consideration. This argument is merely a different iteration of the contention that the circular cash-flow should cause Finance's capitalization

(continued...)

investment of the cash it received from City in the notes of HGI conforms to Rev. Rul. 69-377, supra, and the cycling back of that cash from HGI to City is not inconsistent with the principles revealed in the amplification of that ruling in Rev. Rul. 72-416, supra. The principles of these and the other listed rulings recognize highly artificial transactions with elements of circularity. This was the administrative position of the Commissioner with respect to recognizing the debt of finance subsidiaries as their own during the pendency of the Interest Equalization Tax, and in DEFRA section 127(g)(3)(B) Congress adopted that position as the standard for extending relief from withholding tax obligations.

This interpretation of the phrase "requirements which are based on the principles set forth in Revenue Rulings 69-501, 69-377, 70-645, and 73-110" as used in DEFRA section 127(g)(3)(B) is consistent with the legislative history of that section, which indicates that Congress intended broad relief under the provision

---

[22](...continued)
to be disregarded. Respondent's assertions notwithstanding, HGI did receive consideration for its notes; namely, cash. Respondent's argument concerning lack of consideration comes down to the claim that because HGI immediately (and as prearranged) transferred the cash received as consideration to City as a dividend, HGI's receipt of the cash should be ignored, resulting in a lack of consideration for the notes. We think this argument is merely a variant of the circular cash-flow critique, and we reject it for the same reason: under the principles of the listed rulings, transactions designed to capitalize a finance subsidiary are not disregarded because they contain elements of circularity.

and contemplated coverage for transactions involving what were essentially conduit devices. The legislative history indicates that Congress was concerned about the impact on the economy of the Netherlands Antilles if the use of finance subsidiaries incorporated there were terminated too abruptly. Congress therefore intended to effect "a gradual and orderly reduction of international financing activity in the Netherlands Antilles". General Explanation at 393; see also S. Prt. 98-169 (Vol. 1), at 420-421 (1984). Repeal of the withholding tax on pre-existing obligations was rejected because it

> could have prompted U.S. corporations that had previously issued obligations through Antilles finance subsidiaries in an effort to avoid the tax to assume those pre-existing obligations directly and, thus, discontinue finance operations in the Antilles well before the obligations mature. * * * [General Explanation at 392.]

Congress contemplated that a "gradual and orderly" reduction in the use of finance subsidiaries would be achieved by generally allowing existing obligations to mature under a regime where withholding taxes could be avoided by use of a Netherlands Antilles finance subsidiary. Further, the drafters acknowledged that this approach might permit exploitation of treaty exemptions through conduitlike arrangements for a limited period. As stated in the General Explanation:

> Congress believed that, while offshore financings generally should be scrutinized closely by the IRS and tax treaties should not be used as a basis for establishing conduits whose existence results in a

> transfer of revenues from the U.S. Treasury, the Antilles should have some time to adjust to tax law changes that affect its economy. [Id. at 392-393.]

See also S. Prt. 98-169 (Vol. 1), supra at 420-421. In the transition relief provided in DEFRA section 127(g)(3), Congress thus struck a balance between the generally disfavored use of conduitlike arrangements to secure treaty benefits and a desired adjustment period.

We conclude that the circular cash-flow involved in the capitalization of Finance is not contrary to the principles of the listed rulings and accordingly that Finance's debt/equity ratio did not exceed 5 to 1. We therefore hold that Finance satisfies requirements based on the principles set forth in the listed rulings, which qualifies City's payments of interest during the years at issue for the relief provided in DEFRA section 127(g)(3); namely, deemed treatment as made to a resident of the Netherlands Antilles and therefore exempt from tax under article VIII(1) of the U.S.-Netherlands income tax treaty.[23] Petitioner is therefore not liable for withholding taxes under section 1461.

---

[23] In light of our holding, we need not address petitioner's alternative argument that, absent qualification under DEFRA sec. 127(g)(3), Finance "derived" interest from City within the meaning of article VIII(1) of the U.S.-Netherlands income tax treaty.

To reflect the foregoing,

Decision will be entered

for petitioner.