326 F.3d 63
 AMBASE CORPORATION, A Delaware Corporation, Plaintiff-Appellant,
v.
CITY INVESTING COMPANY LIQUIDATING TRUST, as successor to City Investing Company, a dissolved Delaware Corporation, John J. Quirk, Trustee of City Investing Company Liquidating Trust, and Marion Scharffenberger, Executrix of the Estate of George T. Scharffenberger, Eben W. Pyne, Individually and as Trustee of the City Investing Company Liquidating Trust, Lester J. Mantell, Individually and as Trustee of the City Investing Company Liquidating Trust, Defendants-Appellees.
 Docket No. 02-7230.
 United States Court of Appeals, Second Circuit.
 Argued: November 7, 2002.
 Decided: April 3, 2003.
 
 Mark R. Kravitz, Wiggin & Dana LLP, New Haven, CT (Victor A. Bolden, Wiggin & Dana, LLP, New Haven, CT, Philip Halpern, Collier, Halpern, Newberg, Nolletti & Bock, LLP, White Plains, NY, on the briefs), for Plaintiff-Appellant.
 Paul M. Dodyk, Cravath, Swaine & Moore, New York, NY, for Defendants-Appellees.
 Before: WALKER, Chief Judge, and OAKES and MINER, Circuit Judges.
 MINER, Circuit Judge.
 
 
 1
 This is an appeal from a final judgment entered in the United States District Court for the Southern District of New York (Stanton, J.), dismissing on the pleadings a diversity action brought by plaintiff-appellant AmBase Corporation ("AmBase") against defendants-appellees for indemnification of legal expenses incurred in a tax dispute with the Internal Revenue Service ("IRS"). This dispute concerned certain tax liabilities that allegedly were assumed by the predecessor corporation of defendant-appellee City Investing Company Liquidating Trust (the "Trust"). The District Court dismissed the complaint upon a finding that the express contractual indemnification claim pleaded therein failed to state a claim upon which relief could be granted and that the restitution, unjust enrichment, implied contract, and breach of fiduciary duty claims were time barred by New York's statute of limitations. The District Court further denied AmBase leave to amend its complaint because the breach of contract and breach of third-party beneficiary contract claims AmBase sought to add in its amended complaint were also time barred.
 
 
 2
 This is AmBase's second bite at the litigation apple, its first bite having been taken in an action filed in the Delaware Chancery Court, see AmBase Corp. v. City Inv. Co. Liquidating Trust, 2001 WL 167698, CA No. 18207-NC (Del. Ch.2001) ("Delaware Action"), which was dismissed as time barred by Delaware's shorter statute of limitations. For the reasons that follow, we conclude that AmBase's claims are barred as a matter of law by the doctrine of res judicata. Accordingly, we affirm the judgment of the District Court without reaching the merits of whether AmBase's various claims either fail to state a claim upon which relief can be granted or are time barred.
 
 BACKGROUND
 I. The Parties
 
 3
 City Investing Company ("City") was a publicly-held Delaware holding company that was dissolved and liquidated in 1985. Before its dissolution and liquidation, City was the holding company for a multinational conglomerate with subsidiaries in the manufacturing, housing, and insurance industries. AmBase Corp. v. Comm'r, 81 T.C.M. (CCH) 1657, 1657, 2001 WL 543223 (2001). One of City's wholly-owned subsidiaries was the Home Group, Inc., which changed its name to AmBase in 1989.[1] AmBase owned several operating subsidiaries, including the Home Insurance Company, and in the mid 1980s held assets in excess of $5 billion. AmBase, 81 T.C.M. at 1658.
 
 
 4
 In 1985, as part of its dissolution and liquidation, City consummated a transaction pursuant to which it distributed out its assets and liabilities. The relevant detail of this transaction was that City distributed the outstanding shares of AmBase to City's common stockholders. At the same time, the Trust was formed to, "among other things, assume all of the claims, liabilities, and obligations" of City that were "not otherwise provided for." The Trust was initially funded with assets having an aggregate estimated value of approximately $200 million. City's shareholders were the beneficiaries of the Trust and received ownership units in it. Between 1985 and 1990, the Trust distributed over $280 million in cash and assets to the former stockholders of City.
 
 
 5
 Certain directors and officers of City ("Trustee Defendants") occupied certain fiduciary positions with both AmBase and the Trust. Defendant-appellee George Scharffenberger[2] was a Trustee of the Trust since its creation and served as Chairman of the Board of Directors of AmBase from prior to 1985 until January 1993, and as AmBase's Chief Executive Officer from March 1990 until May 1991. Defendant-appellee Eben Pyne has been a Trustee of the Trust since its creation and was a member of the AmBase Board from prior to 1985 until January 1993. And defendant-appellee Lester Mantell has served as a Trustee of the Trust since its creation, had been a senior City officer before the AmBase spin-off, and served in several officer positions (including Treasurer and Chief Financial Officer) at AmBase from prior to 1985 until December 1996. While at AmBase, Mantell (a tax attorney) had significant responsibility for AmBase's tax matters.
 
 
 6
 II. The Assignment of Certain Liabilities From City to AmBase
 
 
 7
 Pursuant to an August 1985 Assignment Agreement, AmBase assumed certain liabilities of City in consideration for City's payment of $178,767,000 and the unwinding of certain debits and credits relating to intercorporate transactions. Among those liabilities were City's obligations for federal income taxes as the common parent of City's corporate affiliates. In addition, AmBase assumed certain other liabilities and obligations of City, provided that AmBase would be only secondarily liable for the payment of those liabilities.
 
 
 8
 Shortly after the Assignment Agreement was executed, City and the Trustees entered into a Trust Agreement. AmBase was not a party to the Trust Agreement. Among other things, the Trust Agreement provided that the Trustees were to "assume all the claims, liabilities, and obligations (including unascertained or contingent liabilities in expenses) of [City]" listed on Schedule I of the Trust Agreement. Schedule I listed among the liabilities assumed "any cost, expense or liability associated with any claim asserted against City with respect to any act or omission attributable to its operations or affairs which has not been discharged in full or adequately provided for." In addition, Schedule I included, as a liability of the Trust, the costs and liabilities incurred in the defense of any litigation arising after September 25, 1985, in which City Investing was a defendant. Tax liabilities were not expressly mentioned in Schedule I.
 
 III. Tax Dispute
 
 9
 During the latter half of the 1970s, City sought access to the Eurobond market to obtain long-term financing at a fixed rate of interest and to reduce the amount of indebtedness it had borrowed from its American bankers under a revolving credit agreement. AmBase, 81 T.C.M. (CCH) at 1658. At this time, "[t]he practice in the Eurobond market was for issuers of securities to provide indemnification for withholding taxes to foreign investors." Id.[3] Without such indemnification, "[f]oreign investors would not have purchased Eurobond obligations ... because the imposition of withholding taxes would decrease their [rate of] return on the Eurobond obligations." Id.
 
 
 10
 During this time, American companies looking to raise money in the Eurobond market often formed a wholly-owned subsidiary in the Netherlands Antilles, which would issue debt securities in the Eurobond market that were guaranteed by the American parent corporation. Id. The Netherlands Antilles subsidiary would then lend the Eurobond offering proceeds to the U.S. parent or one its affiliates. Id. In certain circumstances, the American parent company's payment of interest on its indebtedness to the Netherlands Antilles subsidiary would be exempt from American withholding taxes "by reason of the application of the U.S.-Netherlands Income Tax Convention, as extended by protocol to the Netherlands Antilles." Id.
 
 
 11
 In 1974, City formed a wholly-owned subsidiary in the Netherlands Antilles. In 1977 and 1979, City raised $30 million and $50 million, respectively, from the Eurobond market through its Netherlands Antilles subsidiary. Id. at 1659. "The payment of principal and interest on these notes was unconditionally guaranteed by City." Id. Furthermore, the notes provided that the issuer would indemnify the holders with respect to any American withholding taxes that might be imposed. Id. City's Netherlands Antilles subsidiary immediately lent the proceeds from the Eurobond offering to City. Id. In May 1984, the 1977 notes were repaid in full. Id. at 1661. In September 1985, City liquidated and dissolved its Netherlands Antilles subsidiary, and the remaining debt on the 1979 notes was "upstreamed" to City. Id.
 
 
 12
 In or about March 1986, the IRS issued a Revenue Agent's Report to City contending that City had failed properly to withhold taxes during tax years 1979 and 1980 for the interest payments it made to the foreign holders of the Eurobonds. The IRS claimed that this subsidiary did not meet the requirements for exemption from United States withholding taxes.[4] The IRS later extended that claim to the period covering tax years 1981 through 1985. The amount of the withholding at issue was almost $21 million. As of March 1986, the accrued interest on that sum was about $10 million.
 
 
 13
 In 1986, AmBase did not pay the taxes alleged to have been owed.[5] Moreover, AmBase did not demand that the Trust pay the taxes allegedly owing, nor did it demand that the Trust assume the defense against the IRS. On or about May 11, 1995, the IRS issued a Notice of Deficiency to AmBase, claiming entitlement to the funds that it alleged should have been withheld.
 
 
 14
 On or about June 29, 1995, AmBase filed a petition with the United States Tax Court on behalf of City contesting the alleged tax liability. By 1995, the accrued interest on the withholding obligation of $21 million had risen to $61 million for a total liability of over $80 million. AmBase did not seek to bring the Trust into the case or to sue the Trust. A little over three-and-a-half years then passed, during which time AmBase did not claim that the Trust was primarily responsible for the withholding taxes.
 
 IV. Delaware Action
 
 15
 On August 14, 2000, AmBase filed a two-count complaint against the Trust and the Trustee Defendants for declaratory and injunctive relief in the Delaware Chancery Court, contending that the potential withholding tax obligation that it had been apprised of fourteen years earlier was not its primary responsibility under the Assignment Agreement. AmBase sought a preliminary injunction preventing the Trust from making distributions that would endanger the Trust's ability to pay the withholding tax liability, which had by then grown to $141 million.[6] AmBase also sought the recovery of $3.2 million in legal expenses and related costs that it had allegedly incurred in connection with the IRS dispute and the Tax Court litigation. In particular, AmBase alleged that, when the IRS dispute arose during the 1980s, the Trustee Defendants
 
 
 16
 apparently taking the position that AmBase was primarily responsible for the alleged withholding obligation, caused AmBase to effectively assume the costs and expenses of defending against the alleged withholding obligation without obtaining independent professional advice or guidance concerning whether the alleged withholding obligation was the primary obligation of Ambase, or the Trust, as successor to [City]. Competent and independent professional advisors likely would have informed management that the alleged withholding obligation was an obligation for which the Trust [was] primarily liable.
 
 
 17
 Count I of the complaint in the Delaware Action sought an order "declaring that the Trust, as successor to [City], is primarily liable for any alleged withholding obligation that is the subject of the [Tax Court litigation]" and alleged that such liability was based on "the Trust Agreement and the Assignment Agreement." In Count II, captioned "Restitution and Implied Contract," AmBase alleged that the Trust had been "unjustly enriched" by AmBase's expenditure of the $3.2 million in legal expenses associated with the Tax Court litigation and that "equity impose[d] an obligation on the Trust to repay [these] costs and expenses incurred on [the Trust's] behalf by AmBase," which was "entitled to restitution from the Trust" for these expenditures. In September 2000, the Trust and the Trustees moved to dismiss the Delaware Action on the grounds that the causes of action alleged were time barred by the Delaware statute of limitations and that the complaint failed to state claims upon which relief could be granted.
 
 
 18
 In a December 14, 2000 ruling from the bench (which was later memorialized in an unpublished order dated February 3, 2001), the Delaware Chancery Court dismissed the Delaware Action with prejudice "solely on the ground that it [was] barred by the statute of limitations and the doctrine of laches." In ruling from the bench, the Chancery Court began its analysis by describing the claims alleged by AmBase as essentially saying: "This primary liability was never contractually shifted from [City] to AmBase. It never was there in the first place. We shouldn't be dealing with this. It is not within the scope of the agency that we took on." Turning to the question of the timeliness of the Delaware Action, the Chancery Court stated:
 
 
 19
 Giving AmBase all of its due, the claim began to run at least as early as the notice of deficiency, because if you don't act on the notice of deficiency by challenging it, it is going to be reduced to a judgment. All along this has been a sum certain, and interest has been running.
 
 
 20
 The Chancery Court then turned to AmBase's allegations that Delaware's three-year statute of limitations should have been equitably tolled because the Trustee Defendants' presence on AmBase's Board of Directors created a conflict of interest that prevented the Board from acting sooner. The court began its analysis with the facts pleaded in the complaint that there were no Trustees remaining on AmBase's Board by the end of 1995 and that, by the end of 1996, Trustee Mantell stopped serving as an officer of AmBase. Therefore, by the end of 1996, "this cloud that supposedly kept this corporate entity from discovering a claim that was based on a contract that was out there in the open" had been lifted.
 
 
 21
 The Chancery Court issued an unpublished written decision dated February 7, 2001, in which it denied AmBase's motion for reargument and sought to expound further on its ruling from the bench. After recapping the facts of the case, the court characterized its prior discussion of when AmBase's claims accrued as follows:
 
 
 22
 In sum, Am[B]ase's claims that the Trust [was] primarily responsible for the potential withholding tax liability, that it should be required to set aside assets sufficient to satisfy that liability, and that it and not Am[B]ase should bear the cost of contesting the liability were surely ripe as of 1995, if not in 1986. These claims could also have been explicitly framed as breaches of the Trust's obligations under the Assignment Agreement; they are in fact pled implicitly as such now.
 
 
 23
 (footnotes omitted).
 
 
 24
 The court then turned to its earlier treatment of AmBase's equitable tolling argument (i.e., that the Trustee Defendants "fraudulently concealed the basis for Am[B]ase's claims or that the claims were inherently undiscoverable before all of [the Trustee Defendants had] departed [from] Am[B]ase"). The court noted "how thin" it had found AmBase's equitable tolling argument to be based on the facts that (1) a majority of AmBase's Board had always been comprised of directors who were not affiliated with the Trust and who were aware of the Trustee Defendants' affiliations with the Trust; and (2) the facts necessary to learn of AmBase's potential liability for the withholding taxes were contained in the Assignment Agreement and the Code, neither of which was "concealed." Even though the court had found AmBase's equitable tolling argument to be "weak," it noted that, "in the end" it had not based its dismissal on a "holding that the statute of limitations began to run before the last of the Trustee Defendants had left Am[B]ase," i.e., in 1986 or 1995. (emphasis added). Instead, the court held that the equitable tolling argument lacked merit, assuming for the purposes of that holding that AmBase's claims accrued as late as December 1996.
 
 
 25
 V. District Court Proceedings and Resolution of the Tax Dispute
 
 
 26
 In January 2001 (after the Delaware Chancery Court had dismissed the Delaware Action but while AmBase's motion for reargument of that decision was pending), AmBase commenced the action giving rise to this appeal by filing a six-count complaint in the District Court against the Trust and the Trustee Defendants. The factual allegations in this complaint closely mirrored those in the complaint filed in the Delaware Action. For example, in Count I of the complaint, AmBase once again sought a declaration that the Trust rather than AmBase was primarily liable for the payment of the disputed withholding taxes and accrued interest, alleging that the liabilities AmBase assumed in the Assignment Agreement did not include the obligation to pay the withholding taxes, which accordingly fell among the other liabilities of City that were assumed by the Trust. AmBase also again sought a declaration that it was entitled to reimbursement from the Trust of the $3.2 million in legal expenses that AmBase had incurred in the Tax Court litigation. In addition to this declaratory relief, AmBase once again sought injunctive relief preventing the Trustees from winding up the Trust's affairs or disbursing any Trust assets to the beneficiaries of the Trust. And, in Count II of the complaint, AmBase once again alleged causes of action sounding in restitution, unjust enrichment, and implied contract, seeking the return of the $3.2 million in legal expenses incurred in the Tax Court litigation.
 
 
 27
 AmBase also alleged two additional causes of action that are relevant to this appeal.[7] In Count III of the complaint, AmBase alleged that the Trustee Defendants breached the fiduciary duties that they owed to AmBase as a result of the conflicts of interest created by their dual service as Trustees of the Trust and officers and directors of AmBase. In particular, AmBase alleged that the Trustee Defendants breached their fiduciary duties to AmBase by: (i) "improperly attempting to impose upon AmBase a purported withholding tax obligation that was and remain[ed] the lawful obligation of the Trust"; (ii) "failing or refusing to obtain independent and competent advice concerning the subject of whether the alleged withholding obligation was properly the responsibility of the Trust"; (iii) "causing AmBase to incur substantial expenses, including attorneys' fees, in attempting to eliminate or minimize the potential exposure relating to the alleged withholding obligation"; (iv) "failing to properly inform new management of AmBase that the withholding tax obligation was one that [was] properly borne, if at all, by the Trust"; and (v) "causing the Trust to distribute hundreds of millions of dollars to [City's] former stockholders [i.e., the beneficiaries of the Trust] when they knew or, in the absence of gross negligence should have known, that the Trust was primarily liable for the alleged withholding[] obligations."
 
 
 28
 In addition to its breach of fiduciary duty claim, AmBase also pleaded a cause of action sounding in indemnification in Count IV of the complaint. In particular, AmBase alleged, pursuant to the Assignment Agreement or the Trust Agreement, that it was entitled to contractual indemnification from the Trust for the legal expenses it incurred in the Tax Court litigation.
 
 
 29
 In February 2001, the Defendants moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss AmBase's complaint on the ground that, inter alia, the causes of action pleaded therein were barred by New York's six-year statute of limitations. The gravamen of the Defendants' motion was that AmBase's claims accrued in 1986 — the date when the IRS issued its Revenue Agent's Report — and that the Delaware Chancery Court's decision in the Delaware Action collaterally estopped AmBase from claiming otherwise. Thus, the Defendants argued, AmBase's claims were time barred some time in 1992. Alternatively, the Defendants argued that, if AmBase's claims accrued as late as December 1996 (when the last of the Trustee Defendants departed from AmBase), under New York's "discovery rule,"[8] AmBase had only two additional years from 1996 in which to file suit, so its claims were time barred after 1998.
 
 
 30
 While the District Court action was pending, on May 23, 2001, the Tax Court resolved the dispute between AmBase and the IRS in favor of AmBase, holding that neither City nor AmBase was liable for the withholding taxes on the interest payments made to the foreign bond holders. See AmBase, 81 T.C.M. (CCH) at 1670. The IRS did not appeal. Consequently, because the Tax Court held in favor of AmBase and there was no longer any liability for the withholding taxes, AmBase's only remaining claim before the District Court was for the $3.2 million in legal expenses, which it alleged that the Trust should pay.
 
 
 31
 Following its victory in the Tax Court, AmBase sought leave in October 2001 to amend its complaint to include two additional causes of action — one for breach of contract and one for breach of a contract to which AmBase was a third-party beneficiary. In the breach of contract claim, AmBase alleged that the Trust breached the Assignment Agreement by: (i) "designating AmBase as [City's] agent for purposes of the [tax dispute with the IRS] and refusing to acknowledge the primary liability therefor"; (ii) "transferring the [tax dispute with the IRS] to AmBase"; and (iii) "failing to be primarily liable for the payment, discharge and performance of the obligations associated with the [tax dispute with the IRS] and the costs and expenses of the [Tax Court litigation] and otherwise failing to live up to the terms and conditions of the Assignment Agreement." In the third-party beneficiary claim, AmBase alleged that it was an intended third-party beneficiary of the Trust Agreement between City and the Trust and that the Trust breached the Trust Agreement by failing to "compensate AmBase for its costs, expenses, and legal fees associated with [the Tax Court litigation]." The District Court decided to defer consideration of AmBase's request for leave to amend its complaint until after it had addressed the Defendants' motion to dismiss the original complaint.
 
 
 32
 In an unpublished opinion and order dated January 11, 2002, the District Court granted the Defendants' motion to dismiss. As an initial matter, the District Court rejected the Defendants' collateral estoppel argument, finding that the Delaware Chancery Court had not specified that AmBase's claims accrued in 1986. According to the District Court, all that was needed to support the Chancery Court's decision that those claims were time barred under the Delaware three-year statute of limitations was that the claims accrued no later than August 14, 1997, i.e., three years before the commencement of the Delaware Action. In particular, the District Court reasoned that no finding had been made by the Chancery Court other than that "the claims were barred because they accrued at some earlier time and nothing supported a tolling of the [Delaware] statute of limitations beyond 1996, which was over three years before AmBase" commenced the Delaware Action. The District Court then dismissed as a matter of law the restitution, unjust enrichment, implied contract, and breach of fiduciary duty claims as being time barred. The District Court agreed with the Defendants' argument that these claims accrued either in 1986 (in which case they were time barred six years later in 1992) or in 1996 (in which case they were time barred two years later in 1998). The District Court next dismissed AmBase's contractual indemnity claim for failing to state a claim upon which relief could be granted. In reaching this conclusion, the District Court interpreted the Assignment Agreement as not providing for indemnification as a matter of law.
 
 
 33
 Six days later, the District Court entered final judgment dismissing all of AmBase's claims. On January 25, 2002, AmBase moved, pursuant to Fed.R.Civ.P. 59(e) and 60(b), to alter or amend the judgment and again requested leave to amend its complaint to include the breach of contract and third-party beneficiary contract claims referenced above. The District Court denied AmBase's motion by a memorandum endorsement dated February 14, 2002, stating that the proposed amendments to AmBase's complaint would be "futile because they would do nothing to alter the date of accrual under the six year statute of limitations ... which applies equally to actions upon an express or an implied contractual obligation or liability." This timely appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 34
 A complaint should not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted "`unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A court's task "in ruling on a Rule 12(b)(6) motion `is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Cooper, 140 F.3d at 440 (quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984)). Furthermore, a court must "accept as true all factual allegations in the complaint." Cooper, 140 F.3d at 440. Finally, "we are entitled to affirm ... on any ground for which there is support in the record, even if not adopted" by the District Court. Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582, 305 F.3d 82, 88 (2d Cir.2002). In particular, we can affirm the dismissal of a complaint for failure to state a claim based on the affirmative defense of res judicata if "all relevant facts are shown by the court's own records," of which we can take judicial notice. Day v. Moscow, 955 F.2d 807, 811 (2d Cir.1992).
 
 II. Res Judicata
 
 35
 Where there is a final state court judgment, a federal court looks to that state's rules of res judicata to determine the preclusive effect of that judgment. Town of Deerfield, N.Y. v. FCC, 992 F.2d 420, 429 (2d Cir.1993) (citing 28 U.S.C. § 1738). Thus, to determine the preclusive effect of the judgment in the Delaware Action, we must look to the Delaware courts' rules of res judicata. In Delaware, a claim is barred by res judicata if: (1) the court that adjudicated the prior action had jurisdiction to do so; (2) the parties to the subsequent action are the same as (or privies to those in) the prior action; (3) the causes of action in both cases are the same or the subsequent action arises from the same transaction that formed the basis of the prior action; (4) the merits in the prior action were decided adversely to the contentions of the plaintiff; and (5) the prior action was final. Maldonado v. Flynn, 417 A.2d 378, 381 (Del.Ch.1980). Here, four of these five elements need not detain us long. The Chancery Court plainly had subject matter and personal jurisdiction to adjudicate the Delaware Action. The parties to the Delaware Action were the same as the parties to the case at bar. The dismissal of the Delaware Action was adverse to AmBase and was a dismissal on the merits. See Loving v. Pirelli Cable Corp., 11 F.Supp.2d 480, 491-92 (D.Del. 1998) (dismissal of action by a Delaware court as time barred by the Delaware statute of limitations is a dismissal on the merits for res judicata purposes), aff'd mem., 178 F.3d 1279 (3d Cir.1999); Williamson v. Columbia Gas & Elec. Corp., 91 F.Supp. 874, 880 (D.Del.) (same), aff'd, 186 F.2d 464 (3d Cir.1950); Townsend v. Chasanov, No. 129,1995, 1995 WL 622452, 1995 Del. LEXIS 367 (Oct. 11, 1995) (same). Finally, the judgment dismissing AmBase's claims in the Delaware Action was final.[9]
 
 
 36
 The only element to which we must devote further attention concerns whether the causes of action were the same in both cases or whether the instant action arises from the same transaction that formed the basis of the Delaware Action. This "transactional view" of claim preclusion was succinctly explained by the Delaware Chancery Court in Maldonado:
 
 
 37
 In earlier times the doctrine of res judicata could be invoked only to bar the relitigation of the same cause of action already litigated and determined.... The modern transactional view of the doctrine of res judicata, however, does not require that the claim subsequently asserted be based on [the] same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication.... The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.... In deciding whether res judicata will bar [a] suit, [the plaintiff's claims] must therefore be analyzed in the light of the transaction [that] he challenges; and, if [the plaintiff's] complaint [in the previous action] and his complaint [in the subsequent action] assert different substantive theories concerning but one claim arising from but one transaction, the doctrine of res judicata may prohibit a second adjudication.
 
 
 38
 417 A.2d at 381-82 (citations omitted). Here, "transaction" refers to a "common nucleus of operative facts." Schnell v. Porta Sys. Corp., 1994 WL 148276, at *4, CA No. 12,948, 1994 Del. Ch. LEXIS 47, at *11 (Apr. 12, 1994) (citing Maldonado); see also Restatement (Second) of Judgments § 24 cmt. b (1982). In other words, "if the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and if the facts were known, or could have been known to the plaintiff in the second action at the time of the first action," then the claims in the second action are precluded. Ezzes v. Ackerman, 234 A.2d 444, 445-46 (Del.1967). This rule against claim splitting "is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times." Maldonado, 417 A.2d at 382. Therefore, when "a plaintiff has had a full, free and untrammelled opportunity to present his facts, but has neglected to present some of them or has failed to assert claims [that] should in fairness have been asserted, he will ordinarily be precluded by the doctrine of res judicata from subsequently pressing his omitted claim in a subsequent action." Id. (internal quotation marks omitted).
 
 
 39
 Turning to the causes of action pleaded here, we initially note that the causes of action, facts alleged, and relief sought in Counts I and II of the original complaint (declaratory relief, injunctive relief, restitution, implied contract, and unjust enrichment) are virtually the same as those pleaded in Counts I and II of the complaint in the Delaware Action. These claims are thus precluded.
 
 
 40
 With respect to the two additional claims pleaded here that were not pleaded in the Delaware Action (breach of fiduciary duty and express contractual indemnification), they too are precluded because, although they are different substantive theories from those pleaded in the Delaware Action, they concern but one claim arising from but one common nucleus of operative facts. For example, the allegations underlying the breach of fiduciary duty claim essentially state that the Trustee Defendants could not serve as both Trustees of the Trust and officers/directors of AmBase because they suffered from a conflict of interest. This conflict of interest allegation was encompassed in the issue framed in the Delaware Action: whether the Trust or the Trustee Defendants improperly failed to assume City's withholding tax liabilities. In fact, this conflict of interest was litigated and decided by the Delaware Chancery Court when it rejected AmBase's equitable tolling argument on the grounds that (1) the Trustee Defendants comprised a minority of the AmBase Board and therefore were unable to influence the position taken by AmBase with regard to the tax payments and (2) all the relevant information necessary for the disinterested directors (who made up a majority of AmBase's Board) to determine whether AmBase was required to pay the disputed taxes was available to all.
 
 
 41
 With respect to the contractual indemnification claim, that too arose out of the same common nucleus of facts that gave rise to the claims pleaded in the Delaware Action and also sought reimbursement of the litigation expenses incurred in the Tax Court litigation. Specifically, the complaint in the Delaware Action alleged that "[p]ursuant to the Trust Agreement and the Assignment Agreement, the alleged withholding obligation is the primary responsibility of the Trust." Indeed, the Chancery Court said of the claims pleaded in the Delaware Action that they "could also have been explicitly framed as breaches of the Trust's obligations under the Assignment Agreement" and were "in fact pled implicitly as such."[10]
 
 
 42
 Turning to the claims pleaded in AmBase's proposed amended complaint, it cannot be gainsaid that the breach of contract and breach of third-party beneficiary contract claims also arose out of the same common nucleus of facts as the claims alleged in the Delaware Action. Each of these claims could have been brought in the Delaware Action because they sought reimbursement of the Tax Court litigation expenses pursuant to agreements that were relied on in the Delaware Action.
 
 
 43
 Accordingly, we conclude that the claims brought in the District Court were barred by the doctrine of res judicata either because they were the same claims brought in the Delaware Action or because they arose from the same common nucleus of facts as the claims in the Delaware Action. Because we are affirming on this alternative basis, we decline to reach the question of whether the District Court properly dismissed AmBase's indemnification claim for failing to state a claim upon which relief could be granted and its remaining claims as time barred under New York's statute of limitations.
 
 CONCLUSION
 
 44
 For the foregoing reasons, the judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 For the sake of simplicity, we refer to this entity as "AmBase."
 
 
 [2]
 Scharffenberger died after the notice of appeal in this case was filed. By Order dated May 13, 2002, this Court substituted John J. Quirk as a Trustee and Marion Scharffenberger, executrix of the Estate of George Sharffenberger, as defendants
 
 
 [3]
 Sections 871(a)(1) and 881(a)(1) of the Internal Revenue Code (the "Code") "generally impose a tax of 30 percent on amounts received as interest from sources within the United States by nonresident alien individuals and foreign corporations."AmBase, 81 T.C.M. (CCH) at 1661. "Payers of such interest are generally required under sections 1441 and 1442 [of the Code] to deduct and withhold therefrom an amount equal to the tax imposed by sections 871 and 881 [of the Code], and in the event that they fail do so so they are liable for those withholding taxes under section 1461 [of the Code]." Id.
 
 
 [4]
 In 1984, Congress prospectively "repealed the 30-percent withholding tax imposed by Sections 871 and 881 [of the Code] with respect to certain interest paid on portfolio debt, referred to as `portfolio interest'."AmBase, 81 T.C.M. (CCH) at 1661. For preexisting obligations, such as those of City, "special transitional relief [was provided] from withholding taxes applicable to interest payments" for corporations that "met requirements based on the `principles' of certain previously revoked [IRS] revenue rulings ...." Id. Essentially, the IRS alleged that City had not met the requirements for transitional relief that would have exempted it from the obligation to pay withholding taxes.
 
 
 [5]
 If it had done so, the running of further interest would have been cut off, and if it ultimately proved that the taxes were not owed, AmBase would have received interest to compensate it for the loss of the time value of its moneySee Rev. Proc. 84-58, 1984-2 C.B. 501; see also I.R.S. Announcement 86-108, 1986-45 I.R.B. 20.
 
 
 [6]
 Eight months before the Delaware Action was commenced, the Trust reported having assets with an aggregate value of approximately $73 million, slightly more than half of the potential withholding tax liability
 
 
 [7]
 AmBase has not pursued on appeal the District Court's dismissal of its remaining claims for fraudulent conveyance and professional negligence/malpractice that were alleged, respectively, in Counts V and VI of the complaint
 
 
 [8]
 New York's discovery rule provides, in relevant part, that:
 [W]here the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.
 N.Y. C.P.L.R. 203(g) (McKinney 2002).
 
 
 [9]
 Although on March 8, 2001, AmBase appealed the Chancery Court's decision to the Delaware Supreme Court, AmBase voluntarily dismissed its appeal two weeks later,see AmBase Corp. v. City Inv. Co. Liquidating Trust, No. 106, 2001 (Del.) (Docket Entry Nos. 4-6).
 
 
 [10]
 On appeal, AmBase characterizes its indemnification claim as both an express indemnification claim and an implied indemnification claim. While we are skeptical about whether the complaint can be read to include an implied indemnification claim, such a claim would, in any event, be precluded for the same reasons that we find the express indemnification claim is precluded: it arises out of the same common nucleus of facts that was the subject of the Delaware Action